IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **THOMAS S. RESCH,**<br><br>*Plaintiff,*<br><br>v.<br><br>**SUGARHOUSE HSP GAMING, L.P.,**<br><br>*Defendant.* | Case No. 2:21-cv-00042-JDW |

### MEMORANDUM

To play, or deal, poker, you "gotta learn to play it right."[1] Despite being both a poker player and a dealer, Thomas Resch did not know when it was time to fold 'em when it came to his time as a dealer. After failing three separate auditions to be a dealer at Rivers Casino, Mr. Resch thought his luck had changed when Rivers gave him a shot on his fourth try. But he didn't perform at the level that Rivers required, and Rivers fired him after less than a week. Mr. Resch contends that Rivers must have discriminated against him based on his age, but he lacks the evidence necessary to sustain that claim. Now the dealin's done, and the Court will grant summary judgment in Rivers's favor.

---

[1] Kenny Rogers, The Gambler (United Artists 1978).

## I.   BACKGROUND

### A.   Rivers Interviews And Eventually Hires Mr. Resch

Mr. Resch has worked as a poker dealer at various casinos. He first applied to work as a dealer at SugarHouse HSP Gaming, L.P. d/b/a Rivers Casino Philadelphia ("Rivers") in 2017. As part of the application, Mr. Resch went through an audition and had a one-on-one interview. Rivers did not hire him as a poker dealer at this time. Undeterred, Mr. Resch applied again in 2018. Following another audition and one-on-one interview, Rivers did not offer him a job.

In early 2019, Mr. Resch applied a third time. He auditioned and had a one-on-one interview with the Poker Daytime Shift Manager, Aaron Harvey. Less than two weeks later, Mr. Resch visited the casino and learned from Mr. Harvey that he did not get the job. At that point, Mr. Resch told Mr. Harvey that he believed that Rivers was refusing to hire him based on his age. He was 70 or 71 years old at the time. Mr. Harvey denied that Mr. Resch's age had anything to do with Rivers's decisions not to hire him.

Some time later, Mr. Resch visited the casino again and asked to speak with Rivers's Poker Room Director, Thomas Bates. During that conversation, Mr. Resch repeated his belief that Rivers was refusing to hire him because of his age, and he advised Mr. Bates that he intended to file a complaint of age discrimination with the U.S. Equal Employment Opportunity Commission. Mr. Bates denied that Rivers had discriminated against Mr. Resch based on age.

A few weeks later, Mr. Harvey contacted Mr. Resch and let him know that Rivers was hiring poker dealers. Mr. Resch submitted an application and completed a fourth audition and interview. This time, Rivers offered Mr. Resch a job. According to Mr. Bates, he decided to give Mr. Resch a chance.

B.     **Mr. Resch's Performance Problems**

Mr. Resch started his first shift at Rivers at 10:00 p.m. on December 20, 2019. He was scheduled to work until 6:00 a.m. the next day. However, the casino was not busy at the time, so Mr. Resch was sent home around 3:00 or 3:30 a.m. At 3:59 a.m., James Moore, one of the poker shift managers, sent an email to Rivers's other poker managers:

> I don't think this is going to come as a surprise to anyone – Thomas Resch is not ready to be a dealer in our poker room. I have received complaints about this dealer tonight that I have never received about any of our dealers ever. I know that Swing shift had about 6. He's a liability on the game from a game protection standpoint. I'm not sure how he got through our audition process – as I have personally failed Thomas multiple times.
>
> I strongly suggest that we move quickly to remove Thomas from a dealing position here. It's his first day – and this is blatantly obvious.

(ECF No. 14-10.) When Mr. Moore arrived for the shift handoff, he learned that Mr. Resch was "having a lot of trouble." (ECF No. 14-1 at 72:14-15.) Then, poker players themselves told Mr. Moore that Mr. Resch "was just not having a good go of it whatsoever." (*Id.* at 20-21.) In addition, either a staff member or a guest advised Mr. Moore that Mr. Resch had turned around in his chair and looked away from the table and a pot during a live hand. This person also told Mr. Moore that Mr. Resch pushed winning pots to the wrong

3

player who did not win the hand. To confirm those reports, Mr. Moore spent some time observing Mr. Resch while he was dealing.

Aside from Mr. Moore, another poker shift manager, Michael Ricci, received complaints about Mr. Resch. At least one guest approached him and complained about Mr. Resch's speed dealing the cards, pitching the cards, and/or running the game. Mr. Ricci also received a complaint that Mr. Resch "looked generally lost while he was dealing" and "kept looking around to see where the action started." (ECF No. 14-5 at 44:7-8, 44:24 – 45:1.) Mr. Ricci observed Mr. Resch while he was dealing and described his manner of dealing as "sloppy" and "way below average on speed." (*Id.* at 59:12-13; 63:21-22.) According to Mr. Ricci, Mr. Resch rolled his deck, which is "not a good thing" for dealers to do. (*Id.* at 81:22-23.)

On December 26, 2019, Mr. Ricci used a BRAVO card that belonged to a dual role shift manager, Alex Gomez, to swipe-in Mr. Resch and determine how many hands he was dealing. At the time, Rivers had not issued Mr. Resch his own BRAVO card yet. Poker dealers can use their BRAVO cards to swipe into Rivers's system to identify themselves and keep track of the number of hands they deal. Rivers's system uses this information to generate a Dealer Downs Report that reflects how many hands a poker dealer dealt in a half-hour period. The Dealer Downs Report from December 26, 2019, indicates that Mr. Gomez (*i.e.*, Mr. Resch) dealt six hands over the course of thirty-two minutes. During the same shift, two other new poker dealers, Wayne Zhou and Erin Bless, dealt 13-15 and 13-18 hands of poker per half hour, respectively. All three were dealing "N/L Holdem," which

the Court understands to be No Limit Texas Holdem. There were, however, other dealers at Rivers who dealt as few or fewer hands than Mr. Resch in similar thirty-minute time periods. Some of those dealers had been dealing N/L Holdem, while others dealt Pot Limit Omaha. In general, it takes longer to deal a game of Pot Limit Omaha than it does to deal a game of N/L Holdem.

Messrs. Moore's and Ricci's boss, Mr. Bates, also watched Mr. Resch deal at Rivers. He explained that it was "hard to watch," as Mr. Resch "seemed to be all over the place." (ECF No. 14-3 at 114:3-6.) For example, he observed Mr. Resch start dealing in the wrong direction and have to start over with a fresh deck. He also watched him push the winning pot to the wrong player. Other customers also complained to Mr. Bates that Mr. Resch was dealing too slowly. In Mr. Bates' estimation, it appeared that Mr. Resch "had absolutely zero experience dealing poker in a casino setting." (*Id.* at 114:15-17.)

### C. Rivers's Termination Decision

Rivers's employees discussed terminating Mr. Resch throughout his brief tenure. On December 21, 2019, Mr. Harvey received the email from Mr. Moore regarding Mr. Resch's performance during his first shift and said he would talk to Mr. Bates about letting Mr. Resch go because "if he's this bad then we will have to move on from him. We gave him a chance and he failed." (ECF No. 14-9 at p.3 of 3.) The same day, Mr. Bates responded to another poker shift manager's inquiry as to how Mr. Resch passed the audition, explaining:

> I felt sorry for the guy so I gave him a shot. Sometimes I have empathy for people who are getting older and ask for a shot. If he's that bad (and we kinda figured he was) let him go. We at least have [sic] him an opportunity. Let's wait till after Christmas and release him.

(*Id.* at p.1 of 3.)

After watching Mr. Resch deal, Mr. Bates decided that he needed to fire him. Believing that Mr. Resch posed a liability for the casino, Mr. Bates spoke with Human Resources about how to proceed. Rivers has a progressive discipline policy, but it is not mandatory. Managers can exercise discretion about whether and when to implement the various disciplinary steps. For example, there were occasions when Rivers fired poker dealers without utilizing any steps in the progressive discipline policy.

When Mr. Resch reported to work on December 27, 2019, the shift supervisor, Mr. Ricci, brought him into an office and handed him a notice, explaining that Rivers was terminating Mr. Resch because he did "not possess the speed, accuracy or developed skillset to effectively deal poker." (ECF No. 14-11.) Mr. Resch was 71 years old at the time of his termination.

### D. Procedural History

On January 6, 2021, Mr. Resch filed a lawsuit against Rivers, asserting claims of age discrimination and retaliation in violation of the Age Discrimination in Employment Act and the Pennsylvania Human Relations Act. Following discovery, Rivers moved for summary judgment on all of Mr. Resch's claims. That motion is ripe for the Court's disposition.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) permits a party to seek, and a court to enter, summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he plain language of Rule 56[(a)] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quotations omitted). In ruling on a summary judgment motion, a court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (quotation omitted). However, "[t]he non-moving party may not merely deny the allegations in the moving party's pleadings; instead he must show where in the record there exists a genuine dispute over a material fact." *Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007) (citation omitted); *see also* Fed. R. Civ. P. 56(c)(1)(A)-(B).

## III. DISCUSSION

Mr. Resch claims that he has direct evidence of age discrimination and circumstantial evidence of both age discrimination and retaliation. But the Court concludes that he has neither.

### A. Direct Evidence Of Age Discrimination

To prevail on his claim that Rivers terminated him based on his age, Mr. Resch "must show that his … age 'actually motivated' and 'had a determinative influence on' [Rivers'] decision to fire him …." *Glanzman v. Metro. Mgmt. Corp.*, 391 F.3d 506, 512 (3d Cir. 2004). To overcome summary judgment with direct evidence of discrimination, Mr. Resch must put forth evidence "sufficient to allow the jury to find that the decision makers placed a substantial negative reliance on [his] age in reaching their decision." *Id.* In other words, Mr. Resch "must produce evidence of discriminatory attitudes about age that were causally related to the decision to fire [him]." *Id.* If he does, then the "burden of persuasion on the issue of causation shifts," and Rivers must prove that it would have fired Mr. Resch even if it had not considered his age. *Id.* (quote omitted). The evidence on which Mr. Resch relies is insufficient to shift the burden to Rivers.

Mr. Bates' characterizations of Mr. Resch as someone who was "older" does not reflect *animus* against older workers. If anything, Mr. Bates' statements that he "felt sorry" for Mr. Resch and "has empathy for people who are getting older" suggest that he favored Mr. Resch because of his age. (ECF No. 14-9.) That favoritism does not lead to "a rational presumption" that Mr. Bates acted on a bias *against* older workers when he decided to terminate Mr. Resch. *Fakete v. Aetna, Inc.*, 308 F.3d 335, 338 (3d Cir. 2002). Nor does any other evidence in the record suggest discriminatory animus. Rivers's communications about Mr. Resch's termination focused on his poor performance, not his age.

8

Finally, Mr. Moore's reference to "that kind of old chestnut" during his deposition does not constitute direct evidence of discrimination because 1) Mr. Moore made this statement during his deposition, long after Mr. Resch's termination; 2) Mr. Bates, not Mr. Moore, made the final decision to terminate Mr. Resch; and 3) Mr. Moore used the colloquialism "old chestnut" to describe the circumstances behind Mr. Resch's hiring, not Mr. Resch himself. (ECF No. 16-5 at 83:24 – 84:5; ECF No. 20-5 at ¶ 2.)

### B.  Circumstantial Evidence

To rely on circumstantial evidence, Mr. Resch must satisfy the familiar *McDonnell Douglas* test for both his age discrimination and retaliation claims. *See Glanzman*, 391 F.3d at 512; *Fasold v. Justice*, 409 F.3d 178, 184 (3d Cir. 2005). Under that test, Mr. Resch must establish a *prima facie* case of discrimination or retaliation; if he does, Rivers must articulate a legitimate non-discriminatory reason for its termination decision; and if it does, then Mr. Resch must offer evidence that tends to show that Rivers's explanation is false or pretextual. *See Fasold*, 409 F.3d at 184.

#### 1.  *Prima facie* case

To prove a *prima facie* case of age discrimination, Mr. Resch must show that he was over 40 at the time he was terminated; he was qualified for his position; he suffered an adverse employment decision; and Rivers replaced him with someone younger. *See id.* Rivers does not challenge Mr. Resch's *prima facie* case of discrimination, so the Court will assume that he has made the required showing.

9

To establish a *prima facie* case of retaliation under the ADEA, Mr. Resch must demonstrate that he engaged in protected employee activity; Rivers subjected him to subsequent and/or contemporaneous adverse action; and there is a causal connection between the protected activity and the adverse action. *See id.* at 188 (citation omitted). There is no dispute that Mr. Resch engaged in protected activity when he told Rivers that he was going to file a charge of age discrimination with the EEOC. There is also no dispute that Rivers subjected him to an adverse action when it fired him. But Mr. Resch cannot show a link between the two.

Mr. Resch's theory is that, after he threatened a complaint, Rivers hired him just so that it could fire him in retaliation for his complaint. That theory makes no sense as a matter of logic or law. There is no temporal connection (or other evidence) that might suggest a link between Mr. Resch's threat and his termination. The Court cannot tell from the record how much time passed between Mr. Resch's threat to file a complaint and his termination. Weeks passed between Mr. Resch telling Mr. Bates that he planned to file a complaint with the EEOC and Rivers's decision to fire him. How many weeks, the Court cannot say based on the evidence before it. Without some indication of temporal proximity between the two events, the Court cannot infer a causal connection.

Even if there were some temporal connection, when a "significant intervening event" separates an employee's protected conduct from his discharge, that event severs any temporal link. *Parker v. Brooks Life Sci., Inc.*, 39 F.4th 931, 937 (7th Cir. 2022); *see also Thomas v. Town of Hammonton*, 351 F.3d 108, 114 (3d Cir. 2003); *Roberts v. Winder*, 16

F.4th 1367, 1382 (10th Cir. 2021). In this case, after Mr. Resch threatened to complain to the EEOC, Rivers hired him, Mr. Resch dealt slowly, he made performance errors, and customers complained about him. Those constitute significant intervening events, and they destroy any causal connection between the protected conduct and the termination decision. Mr. Resch therefore has not demonstrated a *prima facie* case of retaliation.

Mr. Resch argues that the customer complaints were not an intervening event because customers often make meritless complaints. But the volume and nature of the customer complaints about Mr. Resch were substantial, and Rivers was entitled to credit them. This Court's job is not to question the wisdom of Rivers's decision to credit those complaints. *See Fuentes*, 32 F.3d at 765.

Mr. Resch also argues that Rivers's decision to hire Mr. Resch is not an intervening event because it wanted to avoid an EEOC complaint. First, there is no evidence to support that argument. Second, the argument makes little sense. If Rivers was so determined to avoid an EEOC complaint, it would not have fired Mr. Resch as soon as it hired him. That conduct only invited more litigation; it did not avoid it. Although Mr. Resch calls it "anticipatory retaliation," that also makes no sense because once Rivers hired Mr. Resch, it had no reason to think he was going to complain to the EEOC.

### 2. Legitimate nondiscriminatory reason

Rivers points to Mr. Resch's poor performance as a basis for its termination decision. That constitutes a legitimate, non-discriminatory reason. Mr. Resch does not argue otherwise.

### 3. Pretext

To prove pretext, Mr. Resch must present "evidence that could cause a jury 'either [to] (1) disbelieve [Rivers'] articulated legitimate reasons[,] or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of [Rivers'] action.'" *Fowler v. AT&T, Inc.*, 19 F.4th 292, 299 (3d Cir. 2021) (quotation omitted). He has not done so. To satisfy the first prong, he must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [Rivers'] proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence[.]'" *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994) (quotation omitted). No evidence in the record calls into question Rivers's decision. None of the evidence that Mr. Resch cites suggests otherwise.

Mr. Resch suggests that the evidence about his poor performance doesn't justify Rivers's decision. He points out that Rivers did not document the various customer complaints that prompted Mr. Resch's termination. There is no evidence that Rivers documents customer complaints as a matter of course. In addition, within one hour after Mr. Resch finished his first shift at Rivers, the manager, Mr. Moore, recommended

immediate termination based upon customer complaints that he had "never received about any … dealers ever." (ECF No. 14-10.) That level of complaint and their timing "may offer an explanation for [Rivers's] failure to document them formally." *Soto-Feliciano v. Villa Cofresi Hotels, Inc.*, 779 F.3d 19, 29 (1st Cir. 2015). In any event, Mr. Moore created an informal record of the complaints when he referenced them in his email. And, because Rivers decided to terminate Mr. Resch after his first shift ended, it is not strange or suspicious that Rivers did not share the customers' complaints with him.

Mr. Resch also suggests that the Dealer Downs Reports do not support Rivers's assessment of his performance. But those reports do not provide any information about the other poker dealers against whom he seeks to compare himself. For example, the record does not reflect how old those other dealers were, whether they were in an introductory period, whether customers complained about them, or whether their manner of dealing caused shift managers to have liability concerns. Thus, regardless of whether it reveals that other poker dealt as slowly, or slower, than Mr. Resch, the Dealer Downs Report does not suggest that Mr. Resch's age was the real reason that Rivers terminated him.

Rivers was justified in relying on Mr. Resch's poor performance to terminate him. Mr. Resch cites the Third Circuit's decision in *Hugh v. Butler Cnty. Fam. YMCA*, 418 F.3d 265, 269 (3d Cir. 2005) to argue otherwise. In *Hugh*, the Third Circuit drew a distinction between an employee's known lack of qualifications and an employee's poor performance once in that position. *See id*. But Rivers does not argue that Mr. Resch was not qualified

13

to be a poker dealer. It just contends that Mr. Resch was not good at the job. It didn't take long for Rivers to see those performance problems because customers complained about him, his metrics lagged other dealers, and his managers had a chance to observe him firsthand. Rivers could rely on those facts, even if it reached that conclusion quickly.

Mr. Resch also suggests that Rivers's failure to use its progressive discipline policy suggests pretext. But the failure to use such a policy "does not necessarily suggest that the employer was motivated by illegal discriminatory intent or that the substantive reasons given by the employer for its employment decision were pretextual.'" *Carroll v. Guardant Health, Inc.*, 511 F. Supp.3d 623, 646 (E.D. Pa. 2021) (quotation omitted). Rivers's policy gave its managers discretion to use progressive discipline, or not, and Rivers fired at least three other poker dealers without utilizing the progressive discipline policy. It is not the Court's place to decide the wisdom of Rivers's decision to bypass its progressive discipline policy, and a wrong decision does not demonstrate animus. *See Fuentes*, 32 F.3d at 765.

In short, Mr. Resch has no evidence that would cause a fact-finder to disbelieve Rivers's reason for terminating him. Nor has he offered any evidence that discrimination was the real reason for Rivers's decision. He therefore has not shown pretext.

## IV.   CONCLUSION

Mr. Resch thought his luck had changed when Rivers hired him.  But "all the luck in the world [wa]sn't going to change things" for him because "he was simply over

14

matched."[2] He has not made out a *prima facie* case of retaliation, nor does he have evidence of pretext. So the Court will grant Rivers's motion for summary judgment. An appropriate Order follows.

**BY THE COURT:**

*/s/ Joshua D. Wolson*  
JOSHUA D. WOLSON, J.

Date: September 9, 2022

---

[2] Rounders (Miramax 1998).